**2013 UT App 237**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.J., A PERSON UNDER
EIGHTEEN YEARS OF AGE.

A.J.,
Appellant,
*v.*
T.M. AND L.M.,
Appellees.

Opinion
No. 20111113-CA
Filed October 3, 2013

Second District Juvenile, Ogden Department
The Honorable Janice L. Frost
No. 1039586

Gary W. Barr, Attorney for Appellant
Steven C. Russell, Attorney for Appellees
Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGE CAROLYN B. MCHUGH concurred. JUDGE WILLIAM A.
THORNE JR.[1] dissented, with opinion.

CHRISTIANSEN, Judge:

¶1      A.J. (Mother) appeals from the juvenile court's order
terminating her parental rights with respect to her daughter, K.J.
Mother asserts that the juvenile court erred in determining that the

---

1. Judge William A. Thorne Jr. participated in and voted on this
case as a regular member of the Utah Court of Appeals. He retired
from the court before this decision issued.

Juvenile Court Act's (the Act) reunification timelines precluded additional reunification efforts and that the juvenile court's termination of Mother's parental rights was against the clear weight of the evidence. We affirm.

## BACKGROUND

¶2     K.J. was born in April 2010 to Mother.[2] In July 2010, Mother moved with her brother, sister-in-law, and K.J. to Ogden, Utah. N.B. (Father) is K.J.'s natural father. At the time of trial, Father had seen K.J. only one time, had never made visitation arrangements, had not financially supported K.J., and had never attempted to assert his parental rights.[3]

¶3     On July 29, 2010, K.J. was taken by ambulance to an emergency room due to difficulty breathing and lethargy. X-rays revealed four broken ribs, a broken collarbone, and both old and new indications of chronic bilateral subdural hematomas and retinal hemorrhaging. K.J. was taken by helicopter to Primary Children's Medical Center (PCMC) where additional tests indicated chronic subdural fluid collection, a more recent subdural hemorrhage, and healing rib and collarbone fractures. The examining doctor at PCMC reported that the fractures were approximately two to three weeks old and that the likely cause of K.J.'s injuries was inflicted trauma.

¶4     On August 2, the juvenile court signed a warrant ordering K.J. to be placed in the custody of the Division of Child and Family

---

2. "We recite the facts in a light most favorable to the juvenile court findings." *In re S.Y.T.*, 2011 UT App 407, ¶ 2 n.1, 267 P.3d 930.

3. The juvenile court terminated Father's parental rights with respect to K.J. at the same time it terminated Mother's. Father has not challenged the termination of his rights and is not a party to this appeal.

Services (the Division). On August 12, the juvenile court held a pretrial hearing on the State's verified petition to adjudicate K.J. as abused, neglected, or dependent. Mother declined to admit or deny the factual allegations in the petition and the juvenile court therefore deemed the allegations in the petition to be true.[4] Based on these facts, the juvenile court adjudicated K.J. as abused and neglected and ordered that her custody with the Division be continued.

¶5      In its September 1, 2010 order adjudicating K.J. as abused and neglected, the juvenile court ordered Mother to contact the Office of Recovery Services (ORS) to arrange for and pay child support and to complete a child and family plan (the Plan) that required, among other conditions, that Mother maintain stable and suitable housing and stable employment. The juvenile court established reunification with Mother as the primary permanency goal, with adoption as a concurrent permanency goal in the event that Mother "fail[ed] to meet the goals of a treatment plan or follow [court] orders." The court ordered the Division to provide reunification services to Mother until the time set for the permanency hearing. K.J. was thereafter placed in foster care with appellees T.M. and L.M. (Foster Parents). A permanency hearing was set for January 20, 2011, which was subsequently rescheduled for March 21, 2011. During this time, Mother completed most of the goals outlined in the Plan, but she was unable to obtain stable employment or suitable housing. Mother also failed to comply with the juvenile court's order to contact ORS to arrange for and pay child support.

¶6      At the March 21, 2011 hearing, the State submitted a verified petition to terminate Mother's and Father's parental rights with

---

4. Rule 34(e) of the Utah Rules of Juvenile Procedure provides, "A respondent may answer by admitting or denying the specific allegations of the petition, or by declining to admit or deny the allegations. Allegations not specifically denied by a respondent shall be deemed true." Utah R. Juv. P. 34(e).

respect to K.J. The State's request to terminate Mother's rights was based principally on Mother's inability or failure to provide for K.J.'s needs, including Mother's failure to comply with the employment and housing requirements of the Plan and her failure to comply with the juvenile court's order to contact ORS and arrange for child support. The parties then investigated placing K.J. with her maternal grandmother in Mexico but they were ultimately unsuccessful in making the necessary arrangements. On May 26, 2011, Foster Parents filed a third-party petition for termination of Mother's and Father's parental rights with respect to K.J. In August 2011, the State withdrew its termination petition and trial on Foster Parents' petition was set for November 2011.

¶7     Following the termination trial on November 3, 2011, the juvenile court entered findings of fact and conclusions of law and ordered Mother's and Father's parental rights with respect to K.J. terminated. Mother appeals the termination of her parental rights.

ISSUES AND STANDARDS OF REVIEW

¶8     Mother first claims that the juvenile court erred in determining that the timelines established by the Act precluded additional time for reunification of K.J. with Mother. We review the juvenile court's interpretation of the Act for correctness. *In re S.F.*, 2012 UT App 10, ¶ 24, 268 P.3d 831.

¶9     Mother also asserts that the juvenile court's termination of her parental rights is against the clear weight of the evidence. We review a juvenile court's determinations that grounds for termination exist and that termination is in the best interest of the child "for clear error, reversing only if the result is 'against the clear weight of the evidence or leave[s] the appellate court with a firm and definite conviction that a mistake has been made.'" *In re A.K.*, 2012 UT App 232, ¶ 14, 285 P.3d 772 (alteration in original) (quoting *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435). "When a foundation for the [juvenile] court's decision exists in the evidence,

an appellate court may not engage in a reweighing of the evidence." *In re B.R.*, 2007 UT 82, ¶ 12.

ANALYSIS

I. The Juvenile Court Did Not Err In Determining that the Juvenile Court Act Did Not Provide Additional Time for Reunification.

¶10    First, Mother argues that the Act's timelines governing the time for decision on a termination petition and limiting the duration of reunification services are applicable only when termination proceedings are initiated by the Division and not when a third party files a termination petition. She thus claims that the juvenile court erred by applying the timelines set forth in the Act, specifically Utah Code sections 78A-6-312 and -314, to the proceedings before it. Next, Mother argues that even if the timelines are applicable to a proceeding involving a private termination petition, a termination petition need not be adjudicated until eighteen months after the child was removed from the home, in accordance with subsection -314(13)(c), and the juvenile court therefore erred in its conclusion that no time for reunification remained.

A.    The Act's Timelines Were Applicable in This Proceeding.

¶11    Mother argues that because Utah Code section 78A-6-510 identifies specific considerations the juvenile court must make when the Division has instituted proceedings to facilitate the adoption of a child by foster parents, the Act's termination and reunification timelines are not applicable in a termination proceeding initiated by a third party. We disagree.

¶12    "When interpreting a statute . . . [w]e employ plain language analysis to carry out the legislative purpose of the statute as expressed through the enacted text." *See Richards v. Brown*, 2012 UT 14, ¶ 23, 274 P.3d 911. "Where a statute's language is unambiguous

and provides a workable result, we need not resort to other interpretive tools, and our analysis ends." *Id.*

¶13     First, the plain language of the Act does not restrict the timeline for decision on a termination petition only to petitions filed by the Division. The Act provides, "Any interested party, including a foster parent, may file a petition for termination of the parent-child relationship with regard to a child." Utah Code Ann. § 78A-6-504 (LexisNexis 2012).[5] "A decision on a petition for termination of parental rights shall be made within 18 months from the day on which the minor is removed from the minor's home." *Id.* § 78A-6-314(13)(c). Subsection -314(13)(c) makes no distinction between petitions brought by the Division and those brought by a third party; it unambiguously applies to both. Mother argues that a reference to Division-instituted proceedings in a different section of the Act, unrelated to these timelines, compels the result that the given timelines are applicable only to Division-filed termination petitions. This interpretation is neither "obvious," as Mother asserts, nor consistent with the plain language of the statute.

¶14     Second, the shorter timelines imposed by the Act on the underlying reunification proceedings are applicable when a private termination petition has been filed because the reunification timelines operate independently of the termination proceeding.[6] "The time period for reunification services may not exceed 12

---

5. The Act has been amended since the time that K.J. was placed in the Division's custody. However, except as otherwise noted, *see infra* note 7, the provisions in effect at the relevant time do not differ in any way material to our analysis from the provisions now in effect, and we cite the current version of the Act as a convenience to the reader. *See State v. Phillips,* 2012 UT App 286, ¶ 1 n.1, 288 P.3d 310.

6. However, a successful termination petition will immediately put an end to any ongoing reunification proceedings. *See In re S.F.,* 2012 UT App 10, ¶ 53, 268 P.3d 831.

months from the date that the minor was initially removed from the minor's home, unless the time period is extended under Subsection 78A-6-314(8)." *Id.* § 78A-6-312(13)(a) (Supp. 2013). "If reunification services are ordered, a permanency hearing shall be conducted by the court . . . at the expiration of the time period for reunification services." *Id.* § 78A-6-312(16)(a). With respect to a child who is thirty-six months old or younger when removed from the home, the permanency hearing shall be conducted within eight months from the date of removal. *Id.* § 78A-6-312(17) (2012).[7] These timelines are applicable in all proceedings where a child is removed from the home on the basis of a finding of abuse, neglect, or dependency. *See id.* §§ 78A-6-304, -306, -307(17), -311, -312(2), -312(13)(a), -312(16)(a) (2012 & Supp. 2013). The plain language of the Act does not impose a different timeline upon reunification efforts based on the filing of a termination petition, whether by the Division or a private party.

¶15 Because the plain language of the Act does not provide for different termination or reunification timelines when a third-party termination petition has been filed, the juvenile court did not err in concluding that the statutory timelines were applicable to this proceeding.

B. The Act Did Not Allow Additional Time for Reunification.

¶16 Mother next asserts that even if the statutory timelines applied to her reunification efforts, there was nevertheless time remaining to reunify K.J. with Mother at the time of trial. Mother argues that Utah Code section 78A-6-314(13)(c) is the only provision that could have required her to "resume custody immediately" in the event that the termination petition was not granted, and that section -314(13)(c) only requires the court to adjudicate a termination petition within eighteen months of the child's removal from the home. *See id.* § 78A-6-314(13)(c) (2012).

---

7. The 2013 amendments to the Act eliminated this provision. *See* Utah Code Ann. § 78A-6-312 (LexisNexis Supp. 2013).

Because K.J. had only been in an out-of-home placement for fifteen months at the time of trial, Mother argues that three months remained for the Division to reunify K.J. with Mother.

¶17    However, the juvenile court did not base its determination that no time remained for reunification on the time limit for adjudicating a termination petition. Rather, the juvenile court found that "permanency for a child of this age should be achieved within [eight] months with the possibility of another six months," consistent with the reunification timelines provided in Utah Code sections 78A-6-312(17) and -314(8).[8] Because more than fourteen months had elapsed since K.J. had been removed from Mother's home, the juvenile court would have been required to terminate reunification services and make a permanency determination with respect to K.J. if the termination petition had not been granted. *See id.* § 78A-6-312(16)(a) ("[A] permanency hearing shall be conducted by the court . . . at the expiration of the time period for reunification

---

8. The juvenile court interpreted sections 78A-6-312(17) and -314(8) together to provide a maximum of fourteen months of reunification services when a child is less than thirty-six months old at the time of removal. *See* Utah Code Ann. § 78A-6-312(17) (LexisNexis 2012) (establishing shorter reunification timeline for child under thirty-six months of age); *id.* § 78A-6-314(8) (providing for a maximum of two three-month extensions to the period for reunification services upon sufficient findings). Mother's argument that time remained under section -314(13)(c) does not address this interpretation of the Act by the juvenile court. Because Mother has not challenged this aspect of the juvenile court's ruling, we do not review this interpretation of the Act by the juvenile court. *See* Utah R. App. P. 24(a)(9) (requiring the appellant's brief to "contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on"); *Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 25 n.3, 289 P.3d 369 ("[T]he brief must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments." (citation and internal quotation marks omitted)).

services."). The juvenile court would have been required to determine whether K.J. could safely be returned to Mother at that time. *See id.* § 78A-6-315(2)(a). "[I]f a minor is not returned to the minor's parent or guardian *at the permanency hearing*," the court must terminate reunification services and make a final determination regarding an alternate permanency plan, such as termination of parental rights or adoption. *Id.* § 78A-6-314(4) (emphasis added).[9]

¶18    Because K.J. was less than thirty-six months old when she was removed from the home and more than fourteen months had passed since her removal, the juvenile court did not err in determining that the Act precluded continued reunification efforts.

## II. The Juvenile Court's Termination of Mother's Parental Rights Is Not Against the Clear Weight of the Evidence.

¶19    Mother next argues that the juvenile court's decision to terminate her parental rights was against the clear weight of the evidence presented at trial. A court may terminate parental rights with respect to a parent if it finds that any one of the circumstances enumerated in Utah Code section 78A-6-507 exists. *See* Utah Code Ann. § 78A-6-507 (LexisNexis 2012). The juvenile court premised

---

9. Mother argues that the Division wanted to continue reunification services with the ultimate goal of placing K.J. with Mother, who would return to Mexico. Mother asserts that "[t]he only thing that stopped this plan was the petition filed by the foster parents." However, the time for reunification services had expired and the juvenile court found that Mother had failed to comply with the Plan, *see* Utah Code Ann. § 78A-6-314(2)(c), and that insufficient evidence was presented that she was able to safely resume immediate custody, *see id.* § 78A-6-314(2)(b). Thus, the juvenile court would have been unable to place K.J. in Mother's custody and would have been required to make a final determination regarding alternate permanency even in the absence of a termination petition.

the termination of Mother's parental rights upon its conclusion that Mother abused K.J., *see id.* § 78A-6-507(1)(b),[10] that Mother was unfit, *see id.* § 78A-6-507(1)(c), that Mother had been unable to remedy the circumstances causing the child's out-of-home placement and would not be capable of exercising proper and effective parental care in the near future, *see id.* § 78A-6-507(1)(d), and that Mother failed to adjust parentally, *see id.* § 78A-6-507(1)(e). Mother specifically challenges the juvenile court's conclusions that she had failed to adjust parentally, that her failure to pay financial support is evidence that she was unfit, and that she was not capable of exercising proper and effective parental care under subsection 78A-6-507(1)(d)(iii) at the time of trial.

¶20    Mother also challenges the juvenile court's best interest determination, arguing that the juvenile court misunderstood the custody arrangement proposed by the Division. *See id.* § 78A-6-506(3) ("[I]f a parent is found . . . to be unfit or incompetent based upon any of the grounds for termination described in this part, the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered.").

---

10. Mother asserts that the juvenile court "did not make any finding or conclusion that the abuse originally inflicted by [Mother] upon the child was evidence to support the [juvenile] court's conclusion that [Mother] is unfit." It is true that the juvenile court's termination ruling does not premise a specific factual finding that Mother was unfit on the abuse inflicted upon K.J. However, citing Utah Code section 78A-6-507(1)(b), the court concluded that "[Mother], the natural mother, physically abused the child." *See* Utah Code Ann. § 78A-6-507(1)(b) (providing that the juvenile court may terminate parental rights if the court finds "that the parent has neglected or abused the child"). Thus, it can be reasonably inferred that the juvenile court considered Mother's abuse of K.J. as an independent ground for termination under Utah Code section 78A-6-507(1)(b).

A.   The Juvenile Court's Determination that Mother Failed to Adjust Parentally Is Not Against the Clear Weight of the Evidence.

¶21   Mother argues that the juvenile court's determination that she had failed to adjust parentally is against the clear weight of the evidence. The juvenile court "may terminate all parental rights with respect to a parent if the court finds . . . failure of parental adjustment." *Id.* § 78A-6-507(1)(e). Failure of parental adjustment means that "a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home." *Id.* § 78A-6-502(2). A parent's failure to comply with the conditions of a Division service plan within six months of the plan's commencement is evidence of failure of parental adjustment. *Id.* § 78A-6-508(5).[11]

---

11. The dissent asserts that it was improper for the juvenile court to require Mother to obtain stable employment and suitable housing as conditions of the Plan or to consider Mother's compliance with those requirements in determining whether she had failed to adjust parentally because the stability of Mother's income and housing is "unrelated to circumstances that led to the child's placement outside of the home." *See infra* ¶ 49. However, it is not the role of this court to determine what corrective measures are necessary to protect a child from further abuse and neglect. Rather, the juvenile court has the obligation and is in the best position to determine what corrective obligations should be required of a parent, and to determine whether the necessary steps have been taken to ensure a child's protection from further instances of abuse or neglect. *See* Utah Code Ann. § 78A-6-312(12)(a) (LexisNexis Supp. 2013) ("The [juvenile] court shall . . . determine and define the responsibilities of the parent under the child and family plan . . . ."); *In re O.C.*, 2005 UT App 563, ¶ 19, 127 P.3d 1286 (explaining that the juvenile court is given broad discretion in its rulings "based on the juvenile court judges' special

(continued...)

¶22    Mother argues that the juvenile court failed to appropriately weigh her efforts to comply with the Plan at the time of the trial against her previous noncompliance, as required by *In re B.R.*, 2007 UT 82, 171 P.3d 435.[12] *See id.* ¶ 13. Mother also claims that the juvenile court improperly shifted the burden onto her to prove that she had obtained suitable housing and could financially support her child. *See* Utah Code Ann. § 78A-6-506(3) (LexisNexis 2012) ("The court shall in all cases require the petitioner to establish the facts by clear and convincing evidence . . . .").

¶23    First, Mother argues that the juvenile court was required to weigh her past conduct with her present abilities when determining whether she had failed to adjust parentally and that, considering the totality of the evidence, the juvenile court's finding of failure of parental adjustment is against the clear weight of the evidence. "In termination cases, the juvenile court must weigh a parent's past conduct with her present abilities." *In re B.R.*, 2007 UT 82, ¶ 13. However,

> if a parent has demonstrated some improvement in
> parenting ability but not a strong likelihood that the
> parent can provide a proper home for the child in the

---

11. (...continued)
training, experience and interest in this field, and devoted attention to such matters" (ellipses, citation, and internal quotation marks omitted)).These determinations are ones to which we generally defer, affording the juvenile court "a wide latitude of discretion." *See In re K.F.*, 2009 UT 4, ¶ 18, 201 P.3d 985 (citation and internal quotation marks omitted).

12. Mother's argument could also be read as an attack on the juvenile court's factual finding that Mother had failed to comply with the stable housing and income requirements of the Plan. However, because Mother does not marshal the evidence supporting this factual finding, we decline to review the juvenile court's finding. *See In re K.F.*, 2009 UT 4, ¶ 44, 201 P.3d 985.

very near future, after a long period of separation, a
history of problems and failure to remedy, and
deterioration of the relationship between the child
and parent, this court should not overturn a court's
order terminating parental rights.

*Id.* (citation and internal quotation marks omitted).

¶24    Here, the juvenile court found that Mother had failed to
comply substantially with the Plan, which was evidence of failure
of parental adjustment. *See* Utah Code Ann. § 78A-6-508(5)
(LexisNexis 2012). Specifically, the juvenile court found that
Mother had failed to maintain suitable housing and stable
employment and had failed to pay child support when she was
employed. The juvenile court then observed that Mother was not
employed at the time of trial and had only limited employment at
times during the case. The juvenile court also found that Mother's
living situation remained "tenuous" and dependent upon the
father of her second child (Boyfriend), who was married to another
woman, in the country illegally, and potentially subject to
deportation. Based on Boyfriend's absence at trial, his support for
Mother's return to Mexico with both K.J. and his own child, and his
lack of intent to divorce his current wife in favor of a permanent
relationship with Mother, the juvenile court did not find credible
the testimony that Boyfriend was willing to support Mother and
K.J. The juvenile court also found that in light of the Division's
prior determination that Boyfriend's home was unsuitable for an
overnight or trial placement with K.J., insufficient evidence was
presented that Boyfriend's home could satisfy the suitable housing
requirement. Based on these findings, the court determined that
Mother had failed to adjust parentally.

¶25    We do not agree that the juvenile court failed to properly
weigh Mother's past conduct with her present abilities. While the
juvenile court considered Mother's failure to comply with the Plan
as evidence of her failure of parental adjustment, it also considered
her circumstances at the time of the trial in making its

determination regarding parental adjustment. The juvenile court's factual findings are adequate to support its determination that at the time of trial, Mother had not found stable employment or suitable housing and that her living situation with Boyfriend did not evidence stability. Considering the totality of the evidence demonstrating Mother's continued failure to comply with the requirements of the Plan, it was not against the clear weight of the evidence for the juvenile court to determine that Mother had failed to adjust parentally.

¶26 Mother also argues that in considering the evidence of parental adjustment, the juvenile court improperly shifted the burden of proof to her. While the petitioner bears the ultimate burden of proving the grounds for termination by clear and convincing evidence, *see id.* § 78A-6-506(3), once evidence is presented that would justify termination, the burden shifts to the parent to "persuade the court that the [petitioner] had not established [the ground for termination] by clear and convincing evidence," *In re J.B.*, 2002 UT App 267, ¶ 22, 53 P.3d 958.

¶27 Mother claims that Foster Parents presented no evidence that Boyfriend's home was unsuitable or that Boyfriend was unwilling to support Mother and K.J. She argues that the juvenile court therefore improperly imposed the burden of proof on her. We disagree. As discussed above, the juvenile court concluded that Mother's failure to comply with the Plan presented evidence of failure of parental adjustment. The evidence presented at trial demonstrated that Mother had failed to obtain stable employment or suitable housing and otherwise lacked the resources to care for K.J. Given this evidence, Mother bore the burden of demonstrating that her efforts toward finding alternate means of providing for K.J., rather than those prescribed by the Plan, were adequate. *See id.* However, the juvenile court did not find credible the testimony at trial that Boyfriend was willing and able to support Mother and K.J. or that Boyfriend's home was suitable. *See supra* ¶ 24. Given the evidence supporting the juvenile court's determination, we cannot

say that the juvenile court improperly placed the burden of proof on Mother.

B. The Juvenile Court's Determination that Mother's Failure to Pay Child Support Was Evidence that She Was Unfit Is Not Against the Clear Weight of the Evidence.

¶28    Mother argues that the juvenile court's determination that she was unfit was against the clear weight of the evidence because it was based on a flawed understanding of Mother's obligation to provide financial support.[13] The juvenile court "may terminate all parental rights with respect to a parent if the court finds . . . that the parent is unfit or incompetent." Utah Code Ann. § 78A-6-507(1)(c) (LexisNexis 2012). In evaluating whether a parent is fit, the court must consider a parent's "repeated or continuous failure to provide the child with adequate food, clothing, shelter, education, or other care necessary for the child's physical, mental, and emotional health and development by a parent or parents who are capable of providing that care." *Id.* § 78A-6-508(2)(d).

¶29    Mother argues that it was impossible for her to provide financial support for K.J. because she was illegally in the country and thus unable to work legally. She argues, alternatively, that the juvenile court failed to consider whether Mother was "financially able" or "capable" of providing support, as required by statute.

¶30    First, Mother argues that the common law doctrine of impossibility excuses her failure to pay child support as required

---

13. Mother's argument is framed as a challenge to the juvenile court's termination of her parental rights for failure to provide financial support. However, because failure to pay financial support is not a ground for termination, *see* Utah Code Ann. § 78A-6-507 (LexisNexis 2012), we view Mother's argument as a challenge to the juvenile court's reliance on Mother's failure to provide financial support as evidence that she was unfit pursuant to Utah Code section 78A-6-508(2)(d).

by the Plan and that it was therefore improper for the juvenile court to conclude that her failure to provide child support for K.J. was evidence that she was unfit. This common law exception has been applied to statutes governing termination of parental rights "'where a [parent] does not know of the need to protect [parental] rights,' such that 'there is no "reasonable opportunity" to assert or protect parental rights.'" *In re I.K.*, 2009 UT 70, ¶ 22, 220 P.3d 464 (quoting *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 689 (Utah 1986)). Mother argues that because she cannot work legally in the country, the juvenile court ordered her to complete an impossible task, and she therefore had no reasonable opportunity to protect her parental rights.

¶31    We do not decide whether the impossibility exception is applicable to Mother's requirement to pay child support, because Mother challenges this requirement of the Plan for the first time on appeal. Even prior to the juvenile court's adjudication of K.J. as abused and neglected, Mother, represented by counsel, agreed in mediation to cooperate with the Division in developing a service plan as described in the State's verified petition, which included the stable income, suitable housing, and child support requirements. When the Plan was adopted, Mother agreed that she had assisted in its development and agreed to actively participate in the Plan. There is nothing in the record before this court indicating that Mother or her counsel ever objected to the employment and child support requirements of the Plan or requested that the juvenile court order the Plan to be modified to effect her compliance. Mother failed to comply with these provisions of the Plan from the time of its entry until the time of the termination trial. Under these circumstances, Mother cannot now argue on appeal that her compliance with the Plan was impossible, because she never raised this issue before the juvenile court and therefore has not preserved this issue for appellate review.[14] "'[T]o

_____

14. We note that it is unlikely Mother would prevail on this claim even if it were properly preserved. The "essential elements" of the

(continued...)

preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue.'" *In re A.K.*, 2012 UT App 232, ¶ 22, 285 P.3d 772 (alterations in original) (quoting *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801); *cf. Donnelly v. Donnelly*, 2013 UT App 84, ¶ 16, 301 P.3d 6 (determining that a husband had failed to preserve his argument that temporary alimony award was too high for him to afford because he did not demonstrate that the issue had been argued to the trial court).

¶32    Mother further argues that because she was not capable of providing child support as a result of her illegal status, the juvenile court improperly considered her failure to do so as evidence of unfitness. In evaluating whether a parent is fit, the court must consider a parent's "repeated or continuous failure to provide the child with adequate food, clothing, shelter, education, or other care necessary for the child's physical, mental, and emotional health and development by a parent or parents *who are capable of providing that care*." Utah Code Ann. § 78A-6-508(2)(d) (emphasis added).

¶33    Mother argues that because she is in the country illegally, she was unable to obtain legal employment and was therefore incapable of paying child support. However, the juvenile court found that Mother had failed to contact ORS to establish child support and that during the times when Mother was employed, she did not pay any child support. The juvenile court's determination that her failure to provide financial support for K.J. was evidence of unfitness under section 78A-6-508(2)(d) was specifically based

---

14. (...continued)
impossibility exception are that it was (1) impossible for the parent to comply with the statutory requirement (2) "through no fault of [her] own." *See In re Adoption of Baby Boy Doe*, 717 P.2d 686, 690 (Utah 1986) (citation and internal quotation marks omitted). Here, Mother's failure to ever contact ORS to establish child support, as ordered by the court, appears to defeat the argument that she was faultless in her failure to provide child support for K.J.

on her failure to do so "[e]ven when [M]other was employed." Furthermore, while Mother argues that she would be able to provide financial support for K.J. by living with Boyfriend, she nevertheless failed to contact ORS to arrange or pay child support despite having lived with Boyfriend for six months at the time of trial. We thus do not agree that the juvenile court failed to consider whether Mother was capable of providing financial support for K.J., because the juvenile court's determination was based only on her failure to provide support when she was employed or otherwise capable of providing support.

¶34 Because the juvenile court properly considered Mother's failure to pay child support as evidence that she was unfit pursuant to Utah Code section 78A-6-508, we conclude that the juvenile court's determination that Mother was unfit under section 78A-6-507(1)(c) is not against the clear weight of the evidence.

C. The Juvenile Court's Determination that Mother Would Not Have Been Capable of Exercising Proper and Effective Parental Care in the Near Future Is Not Against the Clear Weight of the Evidence.

¶35 Mother next argues that the juvenile court's determination that she would be unable to exercise proper and effective parental care in the near future is against the clear weight of the evidence. The juvenile court may terminate all parental rights with respect to a parent if the court finds

> that the child is being cared for in an out-of-home placement under the supervision of the court or the division[,] . . . that the parent has substantially neglected, wilfully refused, or has been unable or unwilling to remedy the circumstances that cause the child to be in an out-of-home placement[,] . . . [and] that there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future . . . .

Utah Code Ann. § 78A-6-507(1)(d) (LexisNexis 2012).

¶36 Mother argues that the juvenile court's factual finding that no evidence was presented that Mother is capable of parenting her child is unsupported by any evidence, and therefore against the clear weight of the evidence. "To overturn a finding of fact, we require the appellant to marshal all the evidence in support of the finding and then demonstrate that the evidence is legally insufficient to support the finding when viewing it in a light most favorable to the court below." *See In re K.F.*, 2009 UT 4, ¶ 44, 201 P.3d 985 (citation and internal quotation marks omitted). Mother also contends that the juvenile court improperly shifted the burden to her to demonstrate that she was capable of parenting her child. *See* Utah Code Ann. § 78A-6-506(3) (LexisNexis 2012) ("The court shall in all cases require the petitioner to establish the facts by clear and convincing evidence . . . .").

¶37 First, the juvenile court found that "no evidence was presented that [Mother] is capable of parenting the child." Mother misreads the juvenile court's findings as stating that "no evidence was presented on the matter of the [Mother]'s parenting ability" and argues that she is therefore not obligated to marshal the evidence in support of the juvenile court's findings. *See Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733 (explaining appellant's marshaling burden when no evidence supports the challenged finding). However, the juvenile court's other factual findings demonstrate that substantial evidence was presented as to Mother's parenting ability but that the juvenile court found that none of the evidence demonstrated that Mother was presently capable of parenting her child in practice, rather than in theory. Accordingly, the juvenile court found that the evidence demonstrated that Mother was not capable of successfully parenting K.J. on her own.

¶38 Having determined that Mother is incorrect that no evidence supported the juvenile court's factual finding, we decline to review the challenged finding further because Mother has failed to

marshal the evidence in support of the challenged finding. *See In re K.F.*, 2009 UT 4, ¶ 44; *Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 22, 54 P.3d 1177 (explaining that "a scintilla of credible evidence" will overcome a "no evidence assertion" and "demonstrate that the appellant has failed to meet its marshaling burden"). In her opening brief, Mother presents only those facts favorable to her argument on this issue rather than those supporting the challenged finding. In response to Foster Parents' argument that she had failed to marshal the evidence, Mother's reply brief merely asserts that the juvenile court's finding was unsupported by any evidence and reiterates the facts favorable to her argument. This is inadequate to meet the marshaling burden necessary to challenge a factual finding when any evidence supports the finding. *See id; Kimball*, 2009 UT App 233, ¶ 20 n.5.

¶39   Mother next argues that in weighing the evidence of Mother's parental ability, the juvenile court improperly shifted the burden of proof to Mother. While the petitioner bears the ultimate burden of proving the grounds for termination by clear and convincing evidence, *see* Utah Code Ann. § 78A-6-506(3), once evidence is presented that would justify termination, the burden shifts to the parent to "persuade the court that the [petitioner] had not established [the ground for termination] by clear and convincing evidence," *In re J.B.*, 2002 UT App 267, ¶ 22, 53 P.3d 958.

¶40   Mother argues that juvenile court improperly placed the burden of proof on her to prove that she was capable of exercising proper and effective parental care for K.J. because Foster Parents presented no evidence that she was incapable of exercising such care. However, the juvenile court found that the evidence presented showed that Mother did not fully understand K.J.'s needs and lacked the resources to meet those needs in any case. The juvenile court concluded, based on the testimony and evidence presented at trial, that Mother would not succeed at parenting on her own. Mother then had the burden to show that her parenting skills were adequate to persuade the court that the evidence did not prove that she was incapable of caring for K.J. *See id.* While

Mother presented the testimony of her Division-assigned caseworker and peer parent to demonstrate her parenting abilities, the juvenile court found that Mother had never been able to put her parenting ability into practice due to her living situation and that her parenting ability was therefore only theoretical. Given the evidence supporting the juvenile court's determination, we cannot say that the juvenile court improperly placed the burden of proof.[15]

¶41    We conclude that Mother has not demonstrated that the juvenile court's factual findings were erroneous or that the juvenile court improperly shifted the burden of proof. Therefore, we conclude that the juvenile court's determination that Mother would not be capable of exercising proper and effective parental care in the near future is not against the clear weight of the evidence.

D.    The Juvenile Court's Determination that It Would Be in K.J.'s Best Interest to Be Free for Adoption by Foster Parents Is Not Against the Clear Weight of the Evidence.

¶42    Finally, Mother challenges the juvenile court's determination that it would be in K.J.'s best interest to terminate Mother's parental rights, freeing K.J. for adoption by Foster Parents. "[I]f a parent is found . . . to be unfit or incompetent . . . the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered." Utah Code Ann. § 78A-6-506(3) (LexisNexis 2012). The only challenge raised by Mother to the juvenile court's best interest determination is that the determination was based on an incorrect belief that the Division

---

15. We agree that the juvenile court's factual findings could have been more carefully drafted to avoid the implication that the burden of persuasion was on Mother to demonstrate that she was capable of parenting her child, rather than upon Foster Parents. However, having reviewed the juvenile court's findings and conclusions as a whole, we are satisfied that the juvenile court understood and applied the correct burden of proof in this case.

sought to place K.J. with her maternal grandmother rather than with Mother.[16]

¶43 We disagree with Mother's characterization of the juvenile court's best interest determination. The juvenile court concluded that the Division's plan for placement of K.J. "contemplates custody to the maternal grandmother, *if not in law, in fact*." (Emphasis added.) The juvenile court recognized that Mother would have custody of K.J. but determined that because Mother was unable to care for K.J., she would be completely dependent upon the maternal grandmother under the Division's plan. Thus, the juvenile court's conclusion that the Division's placement plan contemplated custody to the maternal grandmother "in fact" is merely a recognition of Mother's dependence on the grandmother under the Division's placement plan. Because Mother does not otherwise challenge the sufficiency of the evidence underlying the juvenile court's best interest determination and we are not left with "a firm and definite conviction that a mistake has been made," we decline to overturn the juvenile court's best interest determination. *See In re A.K.*, 2012 UT App 232, ¶ 14, 285 P.3d 772 (citation and internal quotation marks omitted).

CONCLUSION

---

16. While purporting to be a challenge to termination on the grounds of failure to provide child support, Mother's argument that the juvenile court improperly considered her failure to pay child support could also be read as a challenge to the juvenile court's best interest determination on the same ground. *See* Utah Code Ann. § 78A-6-509(1)(b)(i) (LexisNexis 2012) (requiring the juvenile court to consider whether a parent had paid a reasonable portion of substitute physical care and maintenance in making its best interest determination regarding a child not in the physical custody of the parents). However, to the extent such an argument is raised by Mother's brief, we reject it for the reasons explained above. *See supra* ¶¶ 28–34.

¶44    The juvenile court properly applied the reunification timelines provided by the Act. Mother has failed to demonstrate that the juvenile court's determinations were against the clear weight of the evidence. Grounds for termination exist, and Mother has not successfully challenged the juvenile court's best interest determination.

¶45    We affirm the termination of Mother's parental rights with respect to K.J.

———————

THORNE, Judge (dissenting):

¶46    I respectfully dissent from the majority's decision. I disagree with the majority's determinations regarding the juvenile court's conclusion that Mother has failed to accomplish the necessary parental adjustment required by the applicable section of the Utah Code and further disagree that it has been adequately demonstrated that she is an unfit parent.

I. The Juvenile Court's Parental Adjustment Determination

¶47    The juvenile court determined that Mother had failed to parentally "adjust" based on her inability or failure to secure stable employment or suitable housing. Additionally, the juvenile court was troubled that her living situation with Boyfriend did not evidence stability. Although Mother's employment and housing situation are far from ideal, they are not, in my opinion, evidence of failure of parental adjustment in this matter or sufficient justification for terminating the natural parent-child relationship.

> "Failure of parental adjustment" means that a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that *led to placement of their child outside of their home*, notwithstanding reasonable and appropriate efforts

made by the Division of Child and Family Services to return the child to that home.

Utah Code Ann. § 78A-6-502(2) (LexisNexis 2012) (emphasis added).

¶48    Here, K.J. was placed in the custody of the Division based upon the juvenile court's adjudication of K.J. as abused and neglected. The Plan the juvenile court adopted included multiple requirements; many focused on improving Mother's general parenting issues and reducing the risk of future abuse and neglect of K.J. In particular, the Plan required Mother to complete (1) an age appropriate parenting course; (2) an anger management course and follow all recommendations; and (3) a mental health evaluation and follow all recommendations. The Plan also prohibited Mother from using physical discipline on the child. After trial, the juvenile court determined that Mother had completed a parenting course through the peer parent program, submitted to a mental health assessment and participated in individual therapy following the recommendations of the assessment, and completed an anger management course. By timely completing all of the Plan's requirements designed to address Mother's parenting deficiencies, Mother has for all intents and purposes substantially corrected the very circumstances, conduct, and conditions that led to K.J.'s placement outside of Mother's home. Indeed, the juvenile court acknowledged that Mother had complied with the majority of the service plan except for two factors—stability of income and housing—both of which are unrelated to the reasons for the child's removal.[17] Furthermore,

---

17. The juvenile court did also tangentially note that no evidence was presented that Mother is capable of parenting the child and that there has been no opportunity for Mother to demonstrate that she is able to incorporate what she has learned. However, the evidence before the juvenile court demonstrates that Mother completed all of the Plan's requirements focused on her parenting

(continued...)

trial testimony supports that Mother has corrected the parenting issues that led to K.J.'s removal from Mother's care in the first place.[18]

---

17. (...continued)
issues and as a result has corrected the circumstances, conduct, or conditions that led to K.J.'s removal from her home. Foster Parents did not allege in their termination petition or present evidence at the termination hearing that Mother had failed to correct the behavioral circumstances that led to the removal of the child from Mother.

18. Dr. Marie Green has a doctorate in social work. She conducted a psychological evaluation of Mother and provided approximately fifteen therapy sessions to Mother. Dr. Green testified at the termination hearing that she believed Mother has accepted responsibility for her abuse of K.J. She further testified that Mother's abuse of K.J. can be explained by the fact that K.J. was born premature with high needs and that Mother was young, inexperienced, and without support. Dr. Green opined that Mother has matured, learned better ways to deal with her stress, and is better prepared to parent K.J. In addition, Dr. Green did not believe that Mother would harm the K.J. should she be returned to Mother's care.

The caseworker, Christina Duke, testified at the termination hearing that it is in K.J.'s best interest that the court return custody and reunify Mother and the child subject to conditions. The conditions included a slow transition of the child into Mother's care in the United States before having Mother and the child move to Mexico to live with K.J.'s maternal grandmother. The caseworker's recommendation that Mother and the child move to Mexico appears to be based on the stable family support—both emotional and financial—available to Mother in Mexico. The caseworker further testified that Mother's current home was appropriate and that she believed that the child would be safe with Mother. Specifically, the caseworker responded, "[Y]es. I think so," to the
(continued...)

¶49 Although the Plan required Mother to obtain stable income and housing, the supposed failure of these requirements does not, in this case, demonstrate Mother's failure to parentally adjust. The juvenile court did not place K.J. in the Division's custody based on Mother's lack of stable income and housing, nor did the court determine that said instability created or substantially caused Mother's parenting issues. Instead, the court placed the child in the custody of the Division based on its determination that the child, who had suffered numerous trauma-inflicted injuries, was abused and neglected. It was improper for the court to determine that Mother had failed to adjust based on financial stability—factors unrelated to circumstances that led to the child's placement outside of the home—when Mother completed all the requirements geared toward protecting the child from abuse and neglect.

¶50 Moreover, given Mother's immigration status, the Plan's requirement that Mother obtain employment and essentially procure independent housing is effectively designed for failure as it is legally impossible for Mother to comply with either of these requirements.[19] "[U]nder federal immigration law, only immigrant aliens and nonimmigrant aliens with special permission are entitled to work." *Plyler v. Doe*, 457 U.S. 202, 240 n.6 (1982) (Powell, J., concurring) (citing 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure*, §§ 1.34a., 1.36, 2.6b (1981)); *see also* 8 U.S.C. § 1324a (making employment of aliens unlawful). The Juvenile Court Act requires the juvenile court to "provide a fundamentally fair process to a parent if a party moves to terminate parental rights." Utah

---

18. (...continued)
question, "If [Mother] had her own apartment and it was just [Mother], her child and then [K.J.], do you think [K.J.] being returned to [Mother] with just her other child there, that [K.J.] would be safe in that environment?"

19. The Plan required Mother to "maintain suitable housing and stable employment" and contact ORS regarding support for the child, and establish and pay child support.

Code Ann. § 78A-6-503(2) (LexisNexis Supp. 2013). Mother is faced with two unacceptable alternatives: work, and by so doing commit a crime, or not work and lose her child. It is unfair to implement a plan that precludes a parent's lawful compliance. The implementation of the Plan in this case prevented Mother from receiving a fair opportunity to reunite with her child.

¶51    Here, Mother had no means of achieving the financial requirements of the Plan, and it is unjust to implement a plan that precludes a parent's compliance. Such a plan specifically puts Mother at risk of losing her child and puts the immigrant population in particular risk of losing their children, based primarily on their illegal status and an inability to lawfully obtain stable employment and housing despite any efforts towards or demonstration of parental adjustment. In effect, the juvenile court's termination determination was based on Mother's immigration status in that Mother cannot legally obtain employment and acceptable housing due to her status as an illegal resident. Indeed, several other courts around the country have considered the relevance of illegal status, with the majority concluding that illegal status and deportation are not in themselves grounds for the termination of parental rights. *See In re M.M.*, 587 S.E.2d 825, 832–33 (Ga. Ct. App. 2003) (concluding that the evidence was insufficient to terminate a Mexican's parental rights when the basis was the father's illegal status in this country and the possibility that he could be deported); *In re Angelica L.*, 767 N.W.2d 74, 94–96 (Neb. 2009) (concluding that the evidence was insufficient to terminate a Guatemalan's parental rights on the basis of twice failing to provide a child with adequate medical care and subsequent deportation on the basis of living illegally in this country); *In re E.N.C.*, 384 S.W.3d 796, 805, 806 n.13 (Tex. 2012) (determining that the mere threat of deportation resulting from an unlawful act does not in itself establish endangerment and providing a summary of court decisions considering illegal status and deportation in parental rights termination proceedings).

¶52    Finally, there is some question whether a natural parent's rights can be terminated merely because he or she is not financially or emotionally capable of parenting the child at the time of the termination hearing. *See In re C.J.V.*, No. A13A0792, 2013 WL 3655806, at *6 (Ga. Ct. App. July 16, 2013) (Dillard, J., concurring specially); *see also id.* at *5 ("Indeed, the notion that parental rights can be terminated, in part, because a parent has failed to secure *independent* housing, *stable* employment, or work on 'vocational rehabilitation' (or the like) is not only patently unconstitutional but morally repugnant—as such 'goals,' *inter alia*, disproportionately discriminate against those who are socioeconomically disadvantaged." (footnote omitted)). As such, it is wrong to justify Mother's termination of her parental rights based on the fact that she has had to live with different people and depend on others for financial support. *See id.* ("I find it deeply troubling that both the trial court and dissent justify the termination of the mother's parental rights, in part, because she has moved from place to place, lived with different people, [and] depended on others for financial support[.]"). A family's financial situation should not be a basis for termination. *Cf. Division of Youth & Family Servs. v. P.W.R.*, 11 A.3d 844, 856–57 (N.J. 2011) (holding that a family's tight financial situation is not a proper basis to remove a child from the home). Despite familial financial difficulties, children should be given the benefit of being raised by their parents and parents should be allowed to raise their children free from state interference. *See id.* at 856 ("Despite financial difficulties, many parents have raised children appropriately free from state interference."); *see also In re C.J.V.*, 2013 WL 3655806, at *5 (Dillard, J., concurring specially) ("The State's primary goal must be to maintain and preserve the natural parent-child relationship, not to act as a clandestine adoption agency.").

> The overarching question in a termination proceeding is not whether the child has a model parent, or even whether that parent is presently capable of taking his or her child back in custody, but is instead whether the natural parent-child

> relationship has been *irretrievably* damaged as a result of the parent's unwillingness or inability to care for the child—i.e., that the continuation of the natural parent-child relationship, as it *presently* exists with the child in the custody of the State, is causing or is likely to cause that child serious harm.

*In re C.J.V.*, 2013 WL 3655806, at *5 (Dillard, J., concurring specially) (citation and internal quotation marks omitted).

¶53 To permit state interference based on a parent's financial ability also disproportionately discriminates against single-parent families. A large share of single-parent families live at or below the poverty level when compared to all other families. Jason M. Merrill, Note, *Falling Through the Cracks: Distinguishing Parental Rights from Parental Obligations in Cases Involving Termination of the Parent-Child Relationship*, 11 J.L. & Fam. Stud. 203, 210 (2008) (citing Barbara R. Rowe & Kay W. Hansen, *Child Support Awards in Utah: Have Guidelines Made a Difference?*, 21 J. Contemp. L. 195, 195 (1995)); *see also id.* ("Nationally, it is much more likely for children living in single parent households to live in low-income families." (citing Rhode Island Kids Count, 2008 Rhode Island Kids Count Factbook 10–11 (2008) (citing national statistics regarding single-parent families from the 2006 U.S. Census Bureau American Community Survey))). Moreover, 63% of Hispanic/Latino children live in low-income families. Martin Westerman, *The Interplay of Poverty and Child Welfare*, The Connection (Nat'l Court Appointed Special Advocate Ass'n), Fall 2006, at 7, 10. Mother, a young single-parent illegal immigrant, is severely limited financially, and it is patently unfair and unjust to terminate her parental rights based on her poverty. This is especially true given the fact that Mother has corrected the parenting issues that instigated the removal of K.J. from Mother's care.

¶54 As detailed above, I would hold that the juvenile court erred by basing its parental adjustment determination on factors not in Mother's control and not directly related to the reason for removal

of K.J. from Mother's care. I would, therefore, remand the matter to the juvenile court to determine whether Mother substantially corrected the parenting issues that led to the initial placement of K.J. in the Division's care.

## II. The Juvenile Court's Unfit Parent Determination

¶55    I also disagree with the majority's determination that the juvenile court properly relied upon Mother's failure to pay child support as evidence that she was unfit pursuant to Utah Code section 78A-6-508. *See supra* ¶ 34. The juvenile court determined that Mother was an unfit parent based on her failure to contact ORS to establish support and pay child support even during the times when Mother was employed and living with Boyfriend. *See supra* ¶ 33. Once again, Mother, due to her immigration status, is placed in a difficult situation wherein she is asked to contact an official government office, disclose her status, and hope that she is not then involuntarily transported hundreds of miles from her child. In addition, it is impossible for her to legally comply with the Plan's requirement that she contact ORS and *pay* child support as evidence of parental fitness.[20] The majority argues that "Mother, represented by counsel, agreed in mediation to cooperate with the Division in developing a service plan as described in the State's verified petition, which included the stable income and housing requirements and the child support requirement." *Supra* ¶ 31.

---

20. The majority declines to consider whether the impossibility exception is applicable to Mother's requirement to pay child support, deciding instead that Mother has failed to preserve this issue. *See supra* ¶ 31. Because the impossibility of compliance in this matter is so intertwined in the underlying issue of unfitness, this court should consider it despite any possible preservation problems. *See generally Patterson v. Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828 ("Our preservation requirement is self-imposed and is therefore one of prudence rather than jurisdiction. Consequently, we exercise wide discretion when deciding whether to entertain or reject matters that are first raised on appeal.").

There are no findings pertaining to the circumstances of the mediation. As such, we do not know whether Mother (1) understood the terms of the service plan, (2) accepted the terms out of intimidation, or (3) failed to express the impossibility of the specific provisions out of a fear of losing her parental rights based on such issues. Thus, absent a juvenile court determination following an evidentiary hearing, it is not appropriate to rely on a presumption that Mother voluntarily agreed to the provisions of the service plan in this instance. The child support requirements of the Plan are tantamount to ordering Mother to undertake and document illegal actions that may subject her to deportation and require her to obtain or continue employment, without the required documentation, or risk losing her parental rights of K.J. Under those parameters, there is nothing Mother can legally do to satisfy the juvenile court's requirement of employment or securing an income stream so as to pay child support. Indeed, I believe the juvenile court erred by taking such a constrained view of the parental fitness factors contained in Utah Code section 78A-6-508(2)(d).

¶56    Under Utah Code section 78A-6-508(2)(d), the juvenile court is required to consider, in its determination of whether a parent is unfit, "repeated or continuous failure to provide the child with adequate food, clothing, shelter, education, or other care necessary for the child's physical, mental, and emotional health and development by a parent or parents who are capable of providing that care." Utah Code Ann. § 78A-6-508(2)(d) (LexisNexis 2012). Although it may not be possible for Mother, due to her immigration status, to provide K.J. with the basic necessities without outside assistance, this does not mean that she is not capable of making sure her child's needs are met. Requiring Mother, under these circumstances, to *solely and independently* provide for her child's care bases termination of her parental rights on her lack of legal income despite Mother's significant efforts at parental adjustment and the utilization of other means that may be available to assist her in taking care of her child until such time as either her immigration status changes to allow employment within

the United States or she returns to her country of origin. *See Plyler v. Doe*, 457 U.S. 202, 240 n.6 (1982) (Powell, J., concurring) ("[U]nder federal immigration law, only immigrant aliens and nonimmigrant aliens with special permission are entitled to work."). Given Mother's circumstances,[21] it is unjust and unfair to terminate her

---

21. In a case similar to ours, absent the immigration issue, where the mother was impoverished, Judge Dillard of the Georgia Court of Appeals observed,

> In other words, the mother is really, really poor.
>
> . . . .
>
> Indeed, the notion that parental rights can be terminated, in part, because a parent has failed to secure independent housing, stable employment, or work on "vocational rehabilitation" (or the like) is not only patently unconstitutional but morally repugnant—as such "goals," inter alia, disproportionately discriminate against those who are socioeconomically disadvantaged. To be sure, securing independent housing, stable employment, and furthering one's job training or education are commendable goals, and there is nothing inherently wrong with the government encouraging the citizens it serves to better their lives. What the government is not entitled to do, regardless of any apparent statutory authority for doing so, is to force some generalized, bureaucratic, Orwellian notion of parenting onto citizens who have temporarily lost custody of their children *as a precondition to regaining custody of those children*. Indeed, I find it deeply troubling that both the trial court and dissent justify the termination of the mother's parental rights, in part, because she has moved from place to place, lived with different people, depended on others for financial support, and failed to provide toys for her children. The State has no right to irrevocably sever

(continued...)

parental rights simply because she is not in a position to financially provide for her child in the exact manner set out by the court. The statute does not require Mother to be a perfect parent. *Cf.* Utah Code Ann. § 78A-6-503(4) (LexisNexis Supp. 2013) ("The fundamental liberty interest of a parent concerning the care, custody and management of the parent's child is recognized, protected, and does not cease to exist simply because a parent may fail to be a model parent . . . .").

¶57 As such, if Mother is able to provide for her child's needs by whatever legal means are available to her, she should not be deemed unfit simply because she is personally unable to provide for the support of her child. As a result, I would remand the case to the juvenile court to consider all the factors—not just her failure to pay child support to ORS—relevant to determine whether Mother is able to secure the resources required to provide care for her child. Being an illegal immigrant and poor should no longer provide a legitimate basis for permanently depriving a child of his or her parent or parents and replacing them with a more financially-advantaged substitute. This is not a case where the state has decided that a parent is beyond redemption; this is a private action by people of means seeking to claim a child.

---

21. (...continued)
> the natural parent-child relationship simply because a parent is incapable of providing her children with an idyllic middle-class lifestyle. . . . The State's primary goal must be to maintain and preserve the natural parent-child relationship, not to act as a clandestine adoption agency.
>
> . . . .
>
> An order terminating parental rights is the death penalty of civil cases, and this Court should start treating it as such.

*In re C.J.V.*, No. A3A0792, 2013 WL 3655806, at **5–6 (Ga. Ct. App. July 16, 2013) (Dillard, J., concurring specially) (emphasis and footnotes omitted) (emphasis added).

¶58    In addition, it is not necessary to reach the issue as to whether or not the Juvenile Court Act's timelines are applicable in this proceeding. In my opinion, application of the Act's timelines governing the time permitted to remedy the problem necessitating intervention under either my or the majority's analysis of the termination of parental rights issue, would not change the result given the circumstances in this matter.[22] This is not a timelines case. The termination proceedings in this case did not go beyond the Act's timelines, and the juvenile court had the information before it to decide the parental rights issue without delaying the proceedings. Thus, this case is not the appropriate occasion to announce the application of the Act's timelines to a private petition for termination of parental rights as the majority has chosen to do.

### III. Summary

¶59    The juvenile court found that Mother had complied with the Plan's requirements that were directly related to the problems that necessitated the original removal. It was not, therefore, proper for the court to base its failure of parental adjustment decision on requirements unrelated to the problems which caused the initial removal. Additionally, the court erred by failing to consider all of the circumstances related to whether Mother is able to provide for her child. The outcome of this case is not affected by the application of the Act's timelines, and it is improper for this court to consider that issue. I dissent and would remand to the juvenile court for further consideration.

--------

22. I am not convinced that the timelines imposed by the Act on the underlying reunification proceedings are applicable when a private termination petition has been filed.